1

2

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

3

4

PARALYZED VETERANS OF AMERICA, *et al.*,

5                         Plaintiffs,

6       v.

7   BRUCE MCPHERSON (DEBRA BOWEN), *et al.*,

8                         Defendants.

9   _____

No.  C 06-4670 SBA

**ORDER**

[Docket Nos. 98, 103, 105, 116, 119, 137, 148, 156, 160, 162, 164, 167, 194]

10

11          Before the Court are defendants California Secretary of State Debra Bowen's Motion for

12   Summary Judgment [Docket No. 103]; Registrar of Voters of Marin County Michael Smith's Motion

13   for Summary Judgment and Joinder to Bowen's Motion for Summary Judgment [Docket No. 98];

14   Acting Registrar of Alameda County Dave MacDonald's Motion for Summary Judgment and Joinder

15   to Bowen's Motion for Summary Judgment [Docket No. 105]; and Director of Elections of San

16   Francisco County John Arntz's Joinder to Bowen's Motion for Summary Judgment [Docket No. 116].

17   The plaintiffs, Paralyzed Veterans of America (PVA), American Association of People with Disabilities

18   (AAPD), Ivana Kirola, Russ Bohlke, and Stephen Fort, have filed their own Motion for Summary

19   Judgment/Alternate Motion for Partial Summary Judgment [Docket No. 119] against all defendants

20   except County Clerk-Recorder of Yolo County Freddie Oakley.  Neither defendant Oakley nor plaintiff

21   California Council of the Blind (CCB) have filed a dispositive pleading, and neither have joined in nor

22   opposed any of these motion.

23          Also before the Court are several evidentiary objections and requests for judicial notice:

24   defendant Bowen's Evidentiary Objections to the plaintiffs' Motion for Summary Judgment [Docket

25   No. 137]; defendant Michael Smith's Objections to Evidence in Support of Reply [Docket No. 148];

26   the plaintiffs' Request for Judicial Notice [Docket No. 156]; the plaintiffs' Second Request for Judicial

27   Notice [Docket No. 160]; defendant Arntz's Memorandum in Opposition to the plaintiffs' Second

28   Request for Judicial Notice [Docket No. 164]; and the plaintiffs' Evidentiary Objections to the

Declaration of defendant John Arntz in Opposition to the plaintiffs' Second Request for Judicial Notice [Docket No. 167].   Lastly, plaintiffs have submitted a Motion for Leave to File a Supplemental Complaint against the City and County of San Francisco [Docket No. 162] and Motion for Leave to File a Supplemental Pleading in Support of Plaintiffs' Motion for Summary Judgment [Docket No. 194].[1]

After reading and considering the arguments presented by the parties, the Court finds these matters appropriate for resolution without a hearing.  *See* FED. R. CIV. P. 78.  For the reasons that follow, defendant Bowen's motion for summary judgment is GRANTED against all plaintiffs; defendant Smith's motion for summary judgment is GRANTED against plaintiffs PVA, AAPD, and Bohlke; defendant MacDonald's motion for summary judgment is GRANTED against plaintiff AAPD for lack of standing, and against plaintiff Fort on the merits; and, defendant Arntz' joinder in defendant Bowen's motion is DENIED as moot, as plaintiffs PVA's, AAPD's, and Kirola's claims against the County of San Francisco are no longer "live," given the changes to its voting system since the inception of litigation.

In turn, the plaintiffs' motion for summary judgment/alternative motion for partial summary judgment is DENIED as to defendant Bowen; DENIED as moot as to defendant Arntz; DENIED with prejudice as to defendant Smith; DENIED as to defendant MacDonald against plaintiff AAPD due to lack of standing; and DENIED with prejudice as to defendant MacDonald against plaintiff Fort.

As for the plaintiffs' motion for leave to file a supplemental complaint against the City and County of San Francisco based on their new voting system, the Court DENIES it in part and GRANTS it in part.  The Court DENIES with prejudice with regards to plaintiffs Bohlke and Fort, as they are not San Francisco residents.  Plaintiffs' request to supplement their First Amended Complaint (FAC) with claims for visually impaired voters, which plaintiff PVA does not raise, is DENIED with prejudice with regards to plaintiff Kirola, as she is not visually impaired, but without prejudice with regards to plaintiff AAPD, as it has failed to present sufficient evidence on the supplementation question.  Plaintiffs' request to supplement the FAC with assistive device claims for manually impaired San Francisco voters, is

---

[1]   Plaintiff CCB was not involved in any of the pleadings listed in this paragraph.

1   ///

2   GRANTED with regards to plaintiffs PVA, AAPD, and Kirola, but they may only supplement with

3   claims against defendant Arntz regarding their use of a Sequoia DRE with a VVPAT.

4     Finally, in their Motion for Leave to File a Supplemental Pleading in Support of Plaintiffs'

5   Motion for Summary Judgment (the "Motion for Leave"), the plaintiffs seek to supplement with

6   information regarding developments involving assistive devices and defendant Smith, which occurred

7   after the plaintiffs filed their motion for summary judgment.  The Court DENIES the Motion for Leave

8   with prejudice against plaintiffs Kirola and Fort, who are not Marin County residents; and, the Court

9   DENIES it with prejudice against plaintiffs PVA, AAPD, and Bohlke, as their motion for summary

10  judgment does not address the issue of assistive devices.

11  **BACKGROUND**

12    The plaintiffs in this matter are two organizations, Paralyzed Veterans of America (PVA) and

13  American Association of Persons with Disabilities (AAPD), and three individual eligible voters with

14  disabilities: Ivana Kirola, a manually impaired AAPD member and resident of San Francisco County;

15  Russ Bohlke, a manually impaired PVA member and resident of Marin County; and Stephen Fort, a

16  legally blind resident of Alameda County.  The defendants in this matter are California Secretary of

17  State Debra Bowen (successor in office to originally named defendant Bruce McPherson), Registrar of

18  Voters of Marin County Michael Smith, Acting Registrar of Alameda County Dave MacDonald, and

19  Director of Elections of San Francisco County John Arntz.  The defendants are sued in their official

20  capacities only.

21    The plaintiffs present claims against defendant Bowen.  PVA also presents claims against

22  defendants Arntz and Smith, while AAPD presents claims against defendants Arntz, Smith, and

23  MacDonald.  In addition, plaintiff Kirola presents a claim against defendant Arntz, plaintiff Bohlke

24  presents a claim against defendant Smith, while plaintiff Fort presents a claim against defendant

25  MacDonald.[2]

26  _____

27  [2] The initial complaint in this matter, filed on August 1, 2006, also included plaintiffs California
    Council for the Blind (CCB), Paul Longmore, Manny Fernandez, Dan Kysor, and defendants Oakley
28  and Janice Atkinson as Assistant Registrar of Sonoma County.  *See* Docket No. 1.  Fernandez and
    Atkinson were not included in the FAC, filed two days later.  *See* Docket No. 2.  On December 12,

The plaintiffs' claims involve Fourteenth Amendment equal protection challenges to the alleged denial of the rights of visually and manually impaired voters to vote privately, independently, and with the ability to verify their vote without assistance.  The plaintiffs allege the California Secretary of State has approved,[3] and San Francisco, Marin, and Alameda counties administer, "an unequal, discriminatory system of voting," which deprives the plaintiffs "of their fundamental right to vote in the same manner as all other voters."  Docket No. 4 (First Am. Compl. (FAC), ¶¶ 30-31).  Bowen has filed a motion for summary judgment, in which Smith, MacDonald, and Arntz have joined.  Smith and MacDonald have also filed their own motions for summary judgment.  In turn, the plaintiffs have filed a motion for summary judgment or alternatively partial summary judgment on their claims against these defendants.

Specifically, the plaintiffs object to the voting systems used by San Francisco, Marin, and Alameda Counties.  San Francisco and Marin Counties used the "Election System and Software AutoMARK Voter Assist Terminal" (AutoMARK) voting system in the June 2006 election. *See* Docket No. 4, ¶ 11.  Plaintiffs PVA, AAPD, Kirola, and Bohlke allege the system does not allow voters with disabilities the opportunity to cast their votes or have their votes counted privately and independently. *See id.*  They claim, "Voters with manual dexterity issues, such as voters who cannot grasp paper, will be forced to rely upon the assistance of a third-party to remove a marked ballot from the AutoMARK and place the marked ballot into the ballot box where it will be cast and subsequently counted." *Id.*

Alameda County uses a Sequoia Direct Recording Electronic (DRE) voting system with a Voter

2006, plaintiff Kysor voluntarily dismissed all his claims, which had been pled against defendants Bruce McPherson (the former Secretary of State) and Oakley. *See* Docket No. 55.  On May 24, 2007, plaintiff Longmore voluntarily dismissed all his claims, which had been pled against defendants McPherson and Arntz. *See* Docket No. 64.

In the FAC, the CCB pled claims against McPherson, MacDonald, and Oakley. *See* Docket No. 2, ¶¶ 16, 29-34.  On October 5, 2007, plaintiff CCB voluntarily dismissed its claims against MacDonald, but reserved its claims against McPherson. *See* Docket No. 94.  The CCB, however, failed to oppose defendant Bowen's motion for summary judgment.  The Court thus GRANTS summary judgment for Bowen against CCB, under paragraph 8 of the Court's Standing Order for Civil Cases, which states the failure to oppose a motion constitutes consent to granting it.

With regards to Oakley, the CCB and the AAPD have claims pending against him, *see id.*, ¶¶ 17, 29-34.  Oakley, however, has not filed a motion for summary judgment, nor have the CCB or the AAPD sought summary judgment against him.

[3]     The Secretary of State is responsible for certifying voting machines, and no machine may be used unless it has been approved by the Secretary. *See* CAL. ELEC. CODE § 19201.

Verified Paper Audit Trail (VVPAT) that visually impaired voters cannot read.  According to plaintiffs PVA, AAPD, and Fort, the addition of the VVPAT device renders the DRE voting system inaccessible to voters with visual disabilities.  Allegedly, "Sighted voters can review their vote on the paper produced by the VVPAT to ensure that it comports with their desired selection.  Non-sighted voters, however, do not have access to or the ability to review the information provided by the VVPAT device."  *Id.*, ¶¶ 57-58.  The plaintiffs therefore challenge the constitutionality of California Elections Code section 19250 through 19253 (referred to by the plaintiffs as "the Bowen Bill"), which mandates the use of the VVPAT.

The plaintiffs maintain that providing assistive devices and the addition of one touchscreen voting system at each polling place and/or at a central location would enable manually disabled voters in San Francisco and Marin Counties to vote privately and independently, while the addition of an AutoMARK at every polling location and/or central location would allow visually impaired voters to vote privately and independently in Alameda County.  According to the plaintiffs, the failure to provide these alternative voting systems and the failure to provide assistive devices is an unconstitutional burden on their fundamental right to vote.

The plaintiffs seek a declaratory judgment that the State of California, and San Francisco, Marin, and Alameda counties, are in violation of the Equal Protection Clause of the Fourteenth Amendment.  They also seek an order requiring the defendants to submit and implement a plan to eliminate the alleged deficiencies with the voting systems.

On November 28, 2006, the Court granted the defendants' motion to dismiss the plaintiffs' claims based on alleged violations of the Help America Vote Act (HAVA), 42 U.S.C. § 15301 *et seq*.  *See* Docket No. 53.  The Court concluded HAVA did not create a private right of action enforceable through 42 U.S.C. § 1983.  *See id.*

As a result, the plaintiffs' sole remaining claim is the defendants are in violation of the Equal Protection Clause of the Fourteenth Amendment.  *See* Docket No. 4 (FAC, ¶¶ 29-34).  The plaintiffs' motion for summary judgment, however, does not limit itself to the plaintiffs' equal protection challenge, but instead attempts to reassert previously dismissed HAVA claims and spends a fair amount of attention on HAVA-related arguments.  The plaintiffs have offered no reason for the Court to revisit

*///*

its previous analysis of their HAVA claims, and their motion for summary judgment is an inappropriate

vehicle for an implicit motion for reconsideration.

The Court will therefore limit its analysis to the allegation that the Secretary of State and various

county election officials, acting under color of state law,[4] have approved and administer an unequal,

discriminatory system of voting, by denying visually and manually disabled voters an equal opportunity

to exercise their fundamental right to vote in the same manner as all other voters.

As this case is one that arises "under the Constitution, laws, or treaties of the United States,"

specifically the Fourteenth Amendment, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

### LEGAL STANDARDS

Summary judgment is appropriate if no genuine issue of material fact exists and the moving

party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986).  The party moving for summary judgment must demonstrate that there are no

genuine issues of material fact.  *See Horphag v. Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir.

2007).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the

non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Rivera v. Philip*

*Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005).  An issue is "material" if its resolution could affect

the outcome of the action.  *Anderson*, 477 U.S. at 248; *Rivera*, 395 F.3d at 1146.

In responding to a properly supported summary judgment motion, the non-movant cannot merely

rely on the pleadings, but must present specific and supported material facts, of significant probative

value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 586 n.11 (1986); *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002); *Fed. Trade*

*Comm'n v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001).  In determining whether a genuine issue of material

fact exists, the court views the evidence and draws inferences in the light most favorable to the non-

moving party.  *See Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832

---

[4]        The plaintiffs assert their equal protection claim through the auspices of 42 U.S.C. § 1983, which
provides, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any
State . . . subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights . . .
secured by the Constitution . . . shall be liable to the party injured in an action at law . . . ."

1   (9th Cir. 2004); *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir. 2004).

2       These same standards apply when parties file cross-motions for summary judgment. *See*

3 *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001); *ACLU of N.M. v. Santillanes*,

4 506 F. Supp. 2d 598, 624 (D.N.M. 2007).

5       In this case, the procedural burden on summary judgment will be determined by reference to the

6 level of constitutional scrutiny applicable to the plaintiffs' equal protection challenge. If the "rational

7 basis" test applies, then the burden is on the challenging party to negate "any reasonably conceivable

8 state of facts that could provide a rational basis for the classification." *Bd. of Tr. of Univ. of Ala. v.

9 Garrett*, 531 U.S. 356, 367 (2001) (citations omitted); *see also Kimel v. Fla. Bd. of Regents*, 528 U.S.

10 62, 84 (2000) (under the "rational basis" test, courts presume the constitutionality of a law, and it is the

11 plaintiff's burden to prove otherwise). On the other hand, if strict scrutiny is warranted, then the

12 government bears the burden of showing the law in question is narrowly tailored to advance a

13 compelling state interest. *See Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004); *Republican Party of

14 Minn. v. White*, 536 U.S. 765, 774-75 (2002).

15       As discussed below, because the plaintiffs have failed to provide evidence that the character and

16 magnitude of the burden on their right to vote is severe, under the Supreme Court's standard in

17 *Burdick v. Takushi*, 504 U.S. 428 (1992), the rational basis test applies to their claims. Thus, as the facts

18 are not in dispute in this case, the movant-defendants have the burden to show the plaintiffs cannot meet

19 their burden at trial to show the defendants have no rational basis for their choice of voting systems.

20 In turn, the movant-plaintiffs have the burden to show the defendants have no rational basis for their

21 choice of voting systems.

22                          **ANALYSIS**

23       Before turning to the merits of the parties' cross-motions for summary judgment, there are

24 requests for judicial notice and evidentiary objections pending. There is also a challenge to the standing

25 of plaintiffs Fort and the AAPD to bring suit against defendants MacDonald and Alameda County.

26 **1.      Requests for Judicial Notice and Evidentiary Objections**

27       **a.      Plaintiffs' First Request for Judicial Notice [Docket No. 156]**

28       The plaintiffs request the Court take judicial notice, pursuant to Federal Rule of Evidence

201(b)(2), of two documents that appeared on the Secretary of State's Internet website.  The first is a December 6, 2007 letter approving Marin County's use of the AutoMARK model 200 for the February 2008 election.  The second is a set conditions on the use of the AutoMARK, also issued on December 6, 2007 by the Secretary of State, for all California counties using this voting machine.

Federal Rule of Evidence 201(b) provides the criteria for judicially noticed facts:  "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

"It is not uncommon for courts to take judicial notice of factual information found on the world wide web."  *O'Toole v. Northrop Grumman Corp*., 499 F.3d 1218, 1225 (10th Cir. 2007).  This is particularly true of information on government agency websites, which have often been treated as proper subjects for judicial notice.  *See, e.g., Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005) (taking judicial notice of approval by the National Mediation Board published on the agency's website); *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (per curiam) (taking judicial notice of Texas agency's website); *Denius v. Dunlap*, 330 F.3d 919, 926-27 (7th Cir. 2003) (taking judicial notice of information on official government website); *In re Wellbutrin SR/Zyban Antitrust Litig.*, 281 F. Supp. 2d 751, 754 n.2 (E.D. Pa. 2003) (taking judicial notice of the Food and Drug Administration's list of new and approved drugs); *United States ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003) (citation omitted) ("Public records and government documents are generally considered not to be subject to reasonable dispute . . . .  This includes public records and government documents available from reliable sources on the Internet."); *Cali v. E. Coast Aviation Servs., Ltd.*, 178 F. Supp. 2d 276, 287 n.6 (E.D.N.Y. 2001) (taking judicial notice of documents from Pennsylvania state agencies and Federal Aviation Administration); *In re Agribiotech Sec. Litig.*, No. CV-S-990144 PMP (LRL), slip op., 2000 WL 35595963, *2 (D. Nev. Mar. 2, 2000) ("In this new technological age, official government or company documents may be judicially noticed insofar as they are available via the worldwide web").

The documents being requested for judicial notice are not disputed and their accuracy is not reasonably questioned.  Moreover, there is no objection by any of the defendants to the plaintiffs' first request for judicial notice.  Accordingly, the Court will take judicial notice of the letter and the Secretary

1    ///

2    of State's expressed conditions on the use of the AutoMark.  The plaintiffs' first request for judicial

3    notice is therefore GRANTED.

4        **b.       The Plaintiffs' Second Request for Judicial Notice [Docket No. 160]**

5        The plaintiffs request the Court take judicial notice of a December 18, 2007 letter from Wayne

6    Snodgrass, counsel for defendant Arntz.  The letter states that beginning in February 2008, San

7    Francisco will replace its current AutoMARK voting system with a Sequoia DRE system.  *See* Docket

8    No. 160.  Defendant Arntz does not object to the Court taking judicial notice of that letter. Docket No.

9    164, at 1. Defendant Arntz does, however, object to several arguments the plaintiffs have included with

10   their second request for judicial notice, and asks the Court not to take judicial notice of them or the

11   plaintiffs' interpretation of the significance of the change in voting systems.  In turn, the plaintiffs have

12   filed an evidentiary objection to the argumentative portions of defendant Arntz's declaration opposing

13   their second request for judicial notice.  *See* Docket No. 167.

14       The Court GRANTS the request for judicial notice of the Snodgrass letter, informing the

15   plaintiffs that the County of San Francisco will use Sequoia DREs in future elections rather than

16   AutoMARKs, to the extent it is unopposed.   Defendant Arntz's opposition to the arguments

17   accompanying the letter, and the plaintiffs' evidentiary objection to his declaration in opposition, are

18   both SUSTAINED.

19       **c.       Defendant Secretary of State's Evidentiary Objections [Docket No. 137]**

20       Defendant Secretary of State Debra Bowen objects to evidence offered by the plaintiffs in

21   support of their motion for summary judgment.  In particular, defendant Bowen objects to: (a) Exhibit E

22   to the Declaration of John McDermott on the grounds it is offered without authentication and/or

23   foundation and as it is irrelevant because it is an incomplete portion of the Secretary of State's website;

24   (b) paragraph 17 of the McDermott Declaration because it lacks foundation; (c) paragraphs 4 and 5 of

25   the Russ Bohlke declaration (Exhibit R of the McDermott Declaration) regarding the assistance required

26   to place a ballot in the AutoMARK, and the allegation that Marin County does not provide a sip and puff

27   device, because they are irrelevant and not part of the allegations of the FAC; and (d) the statement at

28   page 13, lines 4 through 22 of the plaintiffs' motion that San Francisco and Marin Counties do not

1  ///

2  provide "sip and puff" devices or head or mouth sticks, as irrelevant and not part of the FAC.  *See*

3  Docket No. 137, at 2.

4          **i.**        **Exhibit E**

5        Exhibit E of the McDermott Declaration is two pages printed from Secretary of State Debra

6  Bowen's website on October 8, 2007.  *See* Docket No. 122, Ex. E.  One is located at

7  http://www.sos.ca.gov/elections/elections_vs.htm  and  the  other  at

8  http://www.sos.ca.gov/elections/hava.htm.  The first page describes voting systems and the requirement

9  under California law that all DREs have paper audit trails.  It further provides links to a number of

10  Secretary of State directives and information about various voting machines.  The second page describes

11  the HAVA and announces new voting equipment is being purchased and deployed.

12        Defendant Bowen objects that this exhibit "is offered without authentication and/or foundation

13  and, should it be authentic, is irrelevant because it is an incomplete portion of the Secretary of State's

14  website."  Docket No. 137, at 2.

15        In response to the latter part of Bowen's objection, the plaintiffs have included a complete

16  printout of these sections of the Secretary of State's website.  *See* Docket No. 153, Ex. A.  Thus, that

17  portion of the objection based upon incompleteness is moot.  *See, e.g.*, *United States ex rel. Fortier v.*

18  *Winters*, No. 00 C 7058, 2007 WL 118225, *5 n.5 (N.D. Ill. Jan. 9, 2007) (unreported) (objection to

19  affidavit as incomplete mooted by supplemental affidavit).

20        The authentication and identification of evidence is governed by Federal Rule of Evidence 901.

21  Rule 902 addresses documents said to be "self-authenticating."  It states that "Extrinsic evidence of

22  authenticity as a condition precedent to admissibility is not required with respect to the following: . . .

23  (5) Official publications.  Books, pamphlets, or other publications purporting to be issued by public

24  authority."  FED. R. EVID. 902(5).  Federal courts consider records from government websites to be self-

25  authenticating under Rule 902(5).  *See, e.g.*, *Estate of Gonzales v. Hickman*, No. ED CV 05-660 MMM

26  (RCx), 2007 WL 3237727, *2 n.3 (C.D. Cal. May 30, 2007) (unreported) (finding report issued by the

27  Inspector General of the State of California on the Office of the Inspector General's website to be self-

28  authentic); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 551 (D. Md. 2007) ("Given the frequency

with which official publications from government agencies are relevant to litigation and the increasing tendency for such agencies to have their own websites, Rule 902(5) provides a very useful method for authenticating these publications.  When combined with the public records exception to the hearsay rule, Rule 803(8), these official publications posted on government agency websites should be admitted into evidence easily"); *United States ex rel. Parikh v. Premera Blue Cross*, No. C01-0476P, slip op., 2006 WL 2841998, *4 (W.D. Wash. Sep. 29, 2006) (determining documents found on government websites to be self-authenticating); *Hispanic Broad. Corp. v. Educ. Media Found.*, No. CV027134CAS (AJWX), 2003 WL 22867633, *5 n.5 (C.D. Cal. Oct. 30, 2003) (unreported) (holding, "exhibits which consist of records from government websites, such as the FCC website are self-authenticating").

The web page printouts purport to be, and Bowen does not dispute they are, reports issued by the Office of the California Secretary of State, a public authority.  They are then "official records" for purposes of Rule 902(5), and are therefore "self-authenticating."

Moreover, "[a] trial court may presume that public records are authentic and trustworthy.  The burden of establishing otherwise falls on the opponent of the evidence, who must come 'forward with enough negative factors to persuade a court that a report should not be admitted.'"  *Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999) (quoting *Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir. 1992)).   Bowen points to nothing in particular in challenging the authenticity or trustworthiness of what are printouts of her official state website.  Defendant Bowen's objection to the printouts is accordingly OVERRULED.

### ii.        Paragraph 17 of the McDermott Declaration

Paragraph 17 of a McDermott Declaration dated October 9, 2007, states in its entirety, "[t]he website for Marin County contains no reference to the accessibility of the voting system it provides." Docket No. 122, ¶ 17.  Defendant Bowen objects to this paragraph as lacking foundation as required by

Federal Rules of Evidence 402[5] and 602.[6]  The plaintiffs counter that paragraph 17 "is admissible under Federal Rule of Evidence 803(10) governing the absence of public records" because the statement was made "after a diligent search" of Marin County's web page.  Docket No. 152, ¶ 3.  The Court SUSTAINS the objection under Rule 402.

Under the Federal Rules of Evidence, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401.  And, under Rule 402, irrelevant evidence is inadmissible. *Id.* 402.  In a December 4, 2007 declaration, McDermott swears, "I diligently searched the Marin County website for any reference to the accessibility of the voting systems it provides before making [the October 9, 2007] declaration." Docket No. 152, ¶ 3. McDermott does not declare, however, when he made this search and whether or not Marin County's website remained completely unchanged.  Further, even if he had, it is unclear what relevance his statement would have to a dispute regarding the use of voting machines by disabled voters.  Thus, his testimony has no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  As such, the Court SUSTAINS Bowen's Rule 402 objection.[7]

Lastly, the Court finds plaintiffs Rule 803(10) argument legally inapplicable for two reasons. Federal Rule of Evidence 803(10) states:

> (10) Absence of public record or entry.  To prove the absence of a record, report, statement, or data compilation, in any form, or the nonoccurrence or nonexistence of a matter of which a record, report, statement, or data compilation, in any form, was regularly made and preserved by a public office or agency, evidence in the form of a

---

[5]    Under Federal Rule of Evidence 402, "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority.  Evidence which is not relevant is not admissible."

[6]    Under Federal Rule of Evidence 602, concerning the lack of personal knowledge by a witness:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony.  This rule is subject to the provisions of rule 703, relating to opinion testimony by expert witnesses.

[7]    Given the Court's ruling on the Rule 402 objection, the Rule 602 objection is moot.

certification in accordance with rule 902, or testimony, that diligent search failed to disclose the record, report, statement, or data compilation, or entry.

First, the Court is aware that this hearsay exception is typically asserted by persons who are custodians of records for public entities, either by certification under Federal Rule of Evidence 902 or by testimony. There is nothing in the rule's text or advisory notes which suggests it may be asserted by non-custodians, non-employees, or members of the public in general, and plaintiffs present no such authority. *See* Fed. R. Evid. 803(10) & 1972 Proposed Rules (Note to Paragraph (10)); *see, e.g.*, *U.S. v. Neff*, 615 F.2d 1235, 1241-42 (9th Cir. 1980) (discussing *IRS* certification of non-occurrence of tax returns). Second, even if this rule applied to persons other than public custodians of records, plaintiffs fail to satisfy the element of Rule 803(10) which requires evidence that Marin County regularly compiles and preserves records, reports, statements, or data on the accessibility of its voting systems, on or off its web site.[8]   Accordingly, the objection to this declaration is SUSTAINED.

### iii.      Paragraphs 4 and 5 of the Bohlke Declaration

Paragraphs 4 and 5 of the Bohlke declaration read:

> 4.      Marin County used the AutoMARK voting system in the June 6, 2006 and November 7, 2006 elections.  I am not able to vote independently and privately with the AutoMARK voting system.  Because of my disability, I have difficulty grasping paper. I would be forced to rely upon the assistance of a third-party to feed the ballot into the AutoMARK machine, to remove the marked ballot from the AutoMARK, insert the marked ballot into the privacy sleeve and place the marked ballot into the ballot box where it would be cast and subsequently counted.  Thus, without third-party assistance, it would be impossible for my ballot to be cast and counted.  The necessary assistance of third-parties destroys privacy because a third-party could observe how I voted.

> 5.      I do not own a sip and puff device, head stick, or mouth stick.  It would be burdensome to obtain one of these devices.  Non-disabled voters do not bear this burden.

Docket No. 122, Ex. R, ¶¶ 4-5.

Defendant Bowen objects to these two paragraphs as irrelevant and not part of the allegations of the FAC.  With respect to paragraph 4, and as discussed more fully below, one of the determinative issues in this case is "'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (citation omitted).  Thus, Bohlke's testimony as to the character and magnitude of the

---

[8]      The Court notes even if McDermott's testimony were somehow admissible either as non-hearsay or under a hearsay exception, it would still be inadmissible under Rule 402.

1    alleged injury to his equal protection rights is relevant.[9]  The objection to paragraph 4 is OVERRULED.

2        As for paragraph 5, most of the other defendants have joined Bowen's objection to the plaintiffs'

3    assistive device claim and their argument that the failure to provide assistive devices to manually or

4    visually impaired voters is a "wealth restriction" on voting that violates the Equal Protection Clause.

5    Moreover, the defendants maintain the FAC contains no hint of an allegation that the defendants violate

6    equal protection guarantees by not supplying disabled voters with assistive devices.

7        The plaintiffs respond by appealing to the simplified notice pleading requirements of Federal

8    Rule of Civil Procedure 8(a).  As a general proposition, the plaintiffs are correct that a complaint must

9    include only "a short and plain statement of the claim showing that the pleader is entitled to relief."

10   FED. R. CIV. P. 8(a)(2).  As such, a "statement" need only give a defendant fair notice of what the claim

11   is and the grounds upon which its rests.  *See Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (per

12   curiam); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002); *Tollis, Inc. v. County of San Diego*,

13   505 F.3d 935, 943 (9th Cir. 2007), *cert. denied*, 128 S.Ct. 2514 (2008).

14       On the other hand, Rule 8 requires the plaintiffs to "give the defendant fair notice of the factual

15   basis of the claim."  *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 841 (9th Cir. 2007) (per

16   curiam).  Thus, "'a plaintiff's complaint should set forth 'either direct or inferential allegations with

17   respect to all the material elements of the claim.'"  *Multi Denominational Ministry of Cannabis &*

18   *Rastafari, Inc. v. Gonzales*, 474 F. Supp. 2d 1133, 1140 (N.D. Cal. 2007) (quoting *Wittstock v. Van Sile,*

19   *Inc.*, 330 F.3d 899, 902 (6th Cir. 2003)).

20       The plaintiffs assert the following allegations in their FAC were sufficiently broad to encompass

21   their assistive device claim and argument that the failure to provide assistive devices is an

22   unconstitutional wealth restriction similar to the poll tax of *Harper v. Virginia Board of Elections*, 383

23   U.S. 663 (1966).  As they state:

24       The FAC alleges that voters with manual disabilities in San Francisco and Marin are
         "unable to vote privately, independently without assistance like all other voters" (¶ 2),
25       the Automark is "not fully accessible to some disabled voters with a variety of physical
         disabilities, including voters with limited manual dexterity" (¶ 10), PVA's members will
26

27   ─────────────────────

     [9]     "'Relevant evidence' means evidence having any tendency to make the existence of any fact that
28   is of consequence to the determination of the action more probable or less probable than it would be
     without the evidence."  FED. R. EVID. 401.

1   be "forced to reveal the content of their votes to a third party when casting their votes
2   with the Automark" (¶ 15) and that plaintiffs suffer from unequal, discriminatory voting
    systems (¶ 34).

3   Docket No. 150, at 11-12.

4       A review of the plaintiffs' FAC reveals nothing either directly or inferentially in its allegations

5   giving the defendants fair notice of their "wealth restriction" or assistive device claim.  Accordingly,

6   the plaintiffs' broad invocation of liberal pleading standards is misplaced.  The plaintiffs' first mention

7   of "wealth restrictions" and the failure of the defendants to provide assistive devices comes in their

8   motion for summary judgment and in their opposition to the defendants' motions for summary

9   judgment.  *See* Docket Nos. 119; 140, at 3, 19, 23.  And once a case has progressed to the summary

10  judgment stage, "'the liberal pleading standards under *Swierkiewicz* and [the Federal Rules] are

11  inapplicable.'"  *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th

12  Cir. 2005) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (per

13  curiam) (holding a plaintiff could not raise a new claim in response to a summary judgement motion));

14  *see also Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996); *Fisher v. Metro. Life Ins. Co.*,

15  895 F.2d 1073, 1078 (5th Cir. 1990) ("[T]his claim was not raised in Fisher's second amended

16  complaint but, rather, was raised in his response to the defendants' motions for summary judgment and,

17  as such, was not properly before the court."); *Netbula, LLC v. Bindview Dev. Corp.*, 516 F. Supp. 2d

18  1137, 1153 n.9 (N.D. Cal. 2007); *Seattle Affiliate of Oct. 22nd Coalition v. City of Seattle*, 430 F. Supp.

19  2d 1185, 1197 (W.D. Wash. 2006) ("Plaintiff cannot unilaterally alter the nature of its claim in response

20  to a summary judgment motion[.]").  As the Eleventh Circuit explained in *Gilmour*, "Efficiency and

21  judicial economy require that the liberal pleading standards under *Swierkiewicz* and Rule 8(a) are

22  inapplicable after discovery has commenced.  At the summary judgment stage, the proper procedure for

23  plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a)."

24  *Gilmour*, 382 F.3d at 1316.  Bowen's objection to paragraph 5 of the Bohlke declaration is accordingly

25  SUSTAINED.

26          **iv.     The Statement Regarding the Absence of "Sip and Puff" Devices**

27      Lastly, defendant Bowen objects to two paragraphs found at page 13 of the plaintiffs' motion

28  for summary judgment, at lines 4 through 22.  These two paragraphs argue that San Francisco and Marin

Counties discriminate against manually disabled voters by allegedly failing to provide "sip and puff" devices (described by the plaintiffs as "head sticks and mouth sticks that enable manually disabled voters to choose their candidates privately and independently"). Docket No. 119, at 13. The plaintiffs allege not providing such devices forces manually disabled voters to rely upon third-party assistance, revealing their choices, or requires them to purchase such devices on their own, which they analogize to a form of poll tax on disabled voters. As with the previous objection, Bowen contends these statements are

///

irrelevant and not part of the FAC. As discussed, the assistive device claim is not part of the plaintiffs' FAC. This objection is therefore SUSTAINED.

> **d.**      **Defendant Smith's Objections to Evidence in Support of Reply [Docket No. 148]**

Defendant Smith objects to evidence offered by the plaintiffs in their opposition to the defendants' motion for summary judgment. Specifically, he objects to paragraph 9 of Russ Bohlke's second declaration, which states, "The necessary assistance of the poll worker eliminated any privacy because I'm sure he could observe my ballot." Defendant Smith objects this statement is hearsay, lacks foundation, and calls for speculation, and is thus inadmissable under Federal Rules of Evidence 403, 602, and 801.

Turning first to plaintiff Bohlke's declaration, in it he recounts his difficulties in using the AutoMark voting system, in Marin County on November 6, 2007. *See* Docket No. 142. Bohlke relates as a result of having only partial use of his hands, he had difficulty grasping the paper ballot generated by the AutoMARK and therefore he "was forced to rely upon the assistance of the poll worker to remove the marked ballot from the AutoMARK, insert the marked ballot into the privacy sleeve and place the marked ballot into the ballot box where it will be cast and subsequently counted." *Id.*, ¶ 8. Bohlke asserts, "The necessary assistance of the poll worker eliminated any privacy because I'm sure he could observe my ballot." *Id.*, ¶ 9.

Turning to Smith's Rule 801 hearsay allegation, Bohlke's statement is not hearsay. Federal Rule of Evidence 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." In this

case the declarant is Bohlke, who is testifying not about a statement, but about what he did, experienced, and personally saw.  A lay witness' testimony in the form of an opinion or an inference may be admissible, where it is "rationally based on the perception of the witness."  FED. R. EVID. 701.  Bohlke testified he was at the polling place, he interacted with the poll worker, observed the poll worker remove his ballot from the AutoMARK, and saw the poll worker insert it into the ballot box.  Thus, his inference the poll worker could observe his ballot was rationally based on his perception.

///

///

Defendant Smith's Rule 403[10] and 602[11] objections are also not well-founded.  Smith offers no argument as to how or why the probative value of this declaration is substantially outweighed by the danger of unfair prejudice.  As to Bohlke's personal knowledge of the events, again, he testified that he was at the polling place, he interacted with the poll worker, observed the poll worker remove his ballot from the AutoMARK, and saw the poll worker insert it into the ballot box.  This evidence is sufficient to support a finding that he had personal knowledge of the matter.  *See* FED. R. EVID. 602.  Smith's objection to Bohlke's declaration is therefore OVERRULED.

**2.    Standing of Stephen Fort and the AAPD to Challenge Alameda County's DRE Voting System and the VVPAT Requirement**

Defendant MacDonald challenges the standing of plaintiffs Stephen Fort and the AAPD. Defendant MacDonald argues the AAPD has failed to show or even allege that a single visually impaired member of the AAPD voted in Alameda County, much less that one used the DRE voting system.

Turning first to the issue of the AAPD's standing, it filed a declaration by James Dickson, its Vice-President for Governmental Affairs, stating Fort is a member.  *See* Docket No. 141.  The declaration, however, is not signed as required by 28 U.S.C. § 1746.  *See id.*  Nonetheless, the plaintiffs

---

[10]    Federal Rule of Evidence 403 provides that, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[11]    For the text of this rule, *see* note 6 *supra*.

1    also argue the AAPD may sue on its own behalf, if an illegal action causes injury to its activities and

2    causes a consequent drain on its resources, relying on *Havens Realty Corp. v. Coleman*, 455 U.S. 363,

3    378-79 (1982), and *El Rescate Legal Services v. Executive Office of Immigration Review*, 959 F.2d 742,

4    748 (9th Cir. 1991).  *See* Docket No. 140, at 16 n.3.  But the AAPD's claim that it must divert resources

5    due to Alameda County's election regulations is found in the same unsigned declaration.  The Court thus

6    finds there is no valid evidence before it which demonstrates that the AAPD has standing to sue

7    Alameda County.

8         Plaintiff Fort argues he has standing because "[he] is blind and cannot read the VVPAT," and

9    therefore "he is denied the same opportunity as other sighted voters to verify that his DRE <u>electronic</u>

10   vote is correct."  Docket No. 140, at 15 (underscoring in original).  Additionally, the plaintiffs argue that

11   Fort suffers the threat of this immediate injury in every future election.  In particular, Fort cannot read

12   the VVPAT when there is a discrepancy between it and the electronic vote.

13        In order to establish an injury in fact sufficient to confer standing to pursue injunctive relief, a

14   plaintiff must demonstrate a "real or immediate threat that the plaintiff will be wronged again . . . ."  *City*

15   *of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *see also Cent. Delta Water Agency v. United States*,

16   306 F.3d 938, 947 (9th Cir. 2002) (noting that "the possibility of future injury may be sufficient to

17   confer standing on plaintiffs").  Here, Fort is realistically threatened by a repetition of the alleged equal

18   protection violation and the alleged unconstitutional requirement of the use of VVPATs with DRE

19   voting machines.  *See Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001) (describing the "realistic

20   repetition" form of injury); *see also Stewart v. Blackwell*, 444 F.3d 843, 854 (6th Cir. 2006) ("[T]he

21   plaintiffs' standing does not depend on any injury suffered in the previous election, but rather on the

22   probability that their votes will be miscounted in upcoming elections."), *superseded by* 473 F.3d 692

23   (6th Cir. 2007) (vacating lower court's judgment as controversy had become moot).  Indeed, an election

24   for the President of the United States is in the not-too-distant future.  There is then, a realistic threat that

25   if the VVPAT requirement is unconstitutional, Fort will suffer this injury in upcoming elections.  Thus,

26   the Court finds he has shown an injury in fact sufficient to confer standing to pursue injunctive relief.

27        Defendant MacDonald also contends Fort cannot establish another necessary element of

28   standing: redressability.  The redress the plaintiffs are seeking is a requirement that Alameda County

1   employ both a DRE and AutoMARK voting system in all polling places, or at least all centrally located

2   polling precincts.  While Alameda sets forth the practical difficulties such a combination would entail,

3   there does not appear to be any real suggestion that such relief would be impossible.  These difficulties

4   may be relevant to the *Burdick* analysis,[12] but they are irrelevant to redressability.  Thus, the Court finds

5   ///

6   Fort has standing to challenge Alameda County's use of the DRE voting system and the requirement

7   that DREs utilize VVPATs.

8   **3.    The Proper Level of Constitutional Scrutiny**

9           The State of California has broad power to control its election process.  "The States possess a

10  "'broad power to prescribe the '[t]imes, [p]laces and [m]anner of holding [e]lections for [s]enators and

11  [r]epresentatives,' Art. I, § 4, cl. 1, which power is matched by state control over the election process

12  for state offices."'"  *Wash. State Grange v. Wash. State Republican Party*, 128 S. Ct. 1184, 1191 (2008)

13  (case citations omitted).  "This power is not absolute, but is 'subject to the limitation that [it] may not

14  be exercised in a way that violates . . . specific provisions of the Constitution.'"  *Id.* (citation omitted;

15  alteration in original).

16          The primary question in dispute is the appropriate level of constitutional scrutiny for reviewing

17  the plaintiffs' equal protection challenge.  Under the Fourteenth Amendment of the United States

18  Constitution, no state shall "deny to any person within its jurisdiction the equal protection of the laws."

19  U.S. CONST. amend. XIV.  As the Supreme Court has recognized, "most laws differentiate in some

20  fashion between classes of persons," and such differentiation or classification is not forbidden.

21  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).  "As a general rule, 'legislatures are presumed to have acted

22  within their constitutional power despite the fact that, in practice, their laws result in some inequality.'"

23  *Id.* (quoting *McGowan v. Maryland*, 366 U.S. 420, 425-26 (1961)).  Thus, "unless a classification

24  warrants some form of heightened review because it jeopardizes exercise of a fundamental right or

25  _____

26  [12]    The plaintiffs repeatedly argue that concerns about cost and administrative convenience do not
    justify discrimination or violating equal protection rights.  This argument fails to account for relevant
27  case law.  In *Weber v. Shelley*, 347 F.3d 1101, 1107 n.2 (9th Cir. 2003), the Ninth Circuit stated, "local
    variety between voting mechanisms can be justified by concerns about costs," and that "elected
28  representatives of the people" may permissibly choose among voting systems "after balancing the pros
    and cons of different systems against their expense."

1    categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only

2    that the classification rationally further a legitimate state interest." *Nordlinger*, 505 U.S. at 10 (citing

3    *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439-41 (1985)); *New Orleans v. Dukes*, 427 U.S.

4    297, 303 (1976)).

5            The plaintiffs assert the disputed California election laws should be subjected to a heightened

6    form of review:  intermediate scrutiny.  The plaintiffs do not, however, claim that heightened scrutiny

7    applies because they are handicapped.  Nor can they, as the Supreme Court and Ninth Circuit have

8    found the disabled are not a suspect or "quasi-suspect" class for equal protection purposes. *See Garrett*,

9    531 U.S. 356, 367-68 (2001) ("the result of *Cleburne* is that States are not required by the Fourteenth

10   Amendment to make special accommodations for the disabled, so long as their actions toward such

11   individuals are rational"); *Cleburne*, 473 U.S. at 446; *Dare v. California*, 191 F.3d 1167, 1174 (9th Cir.

12   1999); *see also Thompson v. Colorado*, 278 F.3d 1020, 1031 (10th Cir. 2001) ("The Equal Protection

13   Clause does not generally require accommodations on behalf of the disabled by the states."), *abrogated*

14   *on other grounds by Guttman v. Khalsa*, 446 F.3d 1027, 1034-35 (10th Cir. 2006).   "If special

15   accommodations for the disabled are to be required, they have to come from positive law and not

16   through the Equal Protection Clause." *Garrett*, 531 U.S. at 368.

17           The plaintiffs claim that intermediate scrutiny is warranted because the defendants' failure to

18   provide multiple voting systems at each polling place or at centrally located polling places unduly

19   burdens their fundamental right to vote.  The plaintiffs contend "that an intermediate equal protection

20   standard of review should be applied in this case," although they maintain their claims should "also

21   prevail under the rational basis test."  Docket No. 150, at 2.  The plaintiffs assert, "The right to vote

22   privately and independently, and to verify one's vote, are important federal statutory rights and any

23   discriminatory denial of these rights must be deemed to be 'severe' and significant, warranting greater

24   than rational basis review under the Equal Protection Clause."  Docket No. 150, at 3.

25           Voting is, of course, a fundamental right. *See, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 787

26   (1983); *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964).  Thus, "any alleged infringement of the right

27   of citizens to vote must be carefully and meticulously scrutinized." *Reynolds*, 377 U.S. at 562; *see also*

28   *Kramer v. Union Free Sch. Dist.*, 395 U.S. 621, 627-28 (1969) (finding limitations on the right to vote

itself are reviewed under strict scrutiny). The Supreme Court, however, has distinguished between the fundamental right to vote and ancillary burdens on citizens in exercising their right to vote. Where the issue is "the mechanics of the electoral process," rather than the right to vote itself, strict scrutiny does not necessarily apply. *See Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995); *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 208 (1999) (Thomas, J., concurring).

In *Burdick*, 504 U.S. at 433, the Supreme Court recognized that "[e]lection laws will invariably impose some burden upon individual voters," and that as a result, "'there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes'" (citation omitted). The *Burdick* Court declared:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Id.* at 434 (citations omitted).

Thus, if "those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (citation omitted); *see also Wash. State Grange*, 128 S. Ct. at 1191. "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify the restrictions.'"[13] *Burdick*, 504 U.S. at 434; *see Wash. State Grange*, 128 S. Ct. at 1192. In this regard, the Court notes both *Burdick* and *Washington State Grange* only provided for two levels of review, rational basis or strict scrutiny, with the required level determined by first determining the extent of the burden, e.g., severe or not, imposed on the voter by the state. In neither case did the Supreme Court provide for the possibility of an intermediate level of review.

---

[13]    Although *Burdick*'s holding speaks in terms of "laws" and "regulations," a plaintiff need only oppose a public entity's election "practice," to trigger a *Burdick* analysis. *See, e.g., Weber*, 347 F.3d at 1102-05 (challenging use of paperless touchscreen voting machines, but not any law or ordinance); *Am. Ass'n of People with Disabilities v. Shelley*, 324 F. Supp. 2d 1120, 1123-25 (C.D. Cal. 2004) (challenging Secretary of State's "directive" decertifying certain types of voting systems).

*Washington State Grange* was decided on March 18, 2008 by a vote of seven to two.[14] Nonetheless, less than a month later, the Supreme Court split three to three, on the issue of whether intermediate scrutiny is available in equal protection challenges to state election laws.  In *Crawford v. Marion County Election Board*, 128 S.Ct. 1610, 1615-16 (2008), Justice Stevens, joined by Chief Justice Roberts and Justice Kennedy, described the analysis for discerning "valid" from "invalid" restrictions on the electoral process as a "balancing approach."  *Id.*  These Justices argued, under *Anderson v. Celebrezze*, 460 U.S. 780 (1983), a court facing an equal protection challenge to a state's election law, should determine the burden imposed on the voter by the challenged law, and determine the state's interest in imposing this burden, then balance the two to see if the state's interest is sufficiently weighty to justify the burden imposed.  *Crawford*, 128 S.Ct. at 1616.[15]  Such a balancing test could encompass a spectrum of standards from rational basis, to intermediate scrutiny, to strict scrutiny.  *See id.*

In contrast, Justice Scalia, joined by Justices Thomas and Alito, concurred in the judgment, but argued challenges to voting laws are resolved under *Burdick*, which only provides for "a deferential 'important regulatory interests' standard rational scrutiny for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote."  *Id.* at 1624.  They also argued, "[a]lthough *Burdick* liberally quoted *Anderson*, *Burdick* forged *Anderson*'s amorphous 'flexible standard' into something resembling an administrable rule."  *Id.*  As such, "[s]ince *Burdick*, we have repeatedly reaffirmed the primacy of its two-track approach."  *Id.*  "Thus, the first step [in these types of cases] is to decide whether a challenged law severely burdens the right to vote."  *Id.*[16]

In this case, *Crawford*'s three-three split does not affect this Court's analysis.  As discussed below, the plaintiffs have failed to provide evidence of anything other than minimal burdens on their right to vote.  Accordingly, the lowest level of scrutiny, the rational basis test, applies whether the

---

[14]     Justice Thomas, delivered the Court's opinion in which Chief Justice Roberts and Justices Stevens, Souter, Ginsburg, Breyer, and Alito joined. *Wash. State Grange*, 128 S. Ct. at 1187.  Justice Scalia dissented, joined by Justice Kennedy.  *Id.*

[15]     Unlike the *Burdick* approach, where a court first determines the level of burden, severe or not, which then mandates strict or rational scrutiny, respectively, under the balancing approach put forth by Justices Stevens, it would not matter whether a court determined the burden or the state's interest first.

[16]     Having accounted for six justices, the Court notes Justice Souter dissented, joined by Justice Ginsburg, while Justice Breyer dissented separately.  *Crawford*, 128 S.Ct. at 1613.

proper framework is a "balancing approach" or a "two track approach."[17]

Turning to Ninth Circuit jurisprudence, the leading case on the issue of state election law challenges is *Weber v. Shelley*, 347 F.3d 1101 (9th Cir. 2003). In *Weber*, the plaintiff challenged Riverside County's decision to replace traditional paper ballots with computerized touchscreen technology. *Id.* at 1102-03. The plaintiff claimed the lack of a voter-verified paper trail violated her rights to equal protection and due process, arguing an electronic system would be manipulated by programmers. *Weber*, 347 F.3d at 1103-04. The *Weber* court explained while the right to vote is fundamental, "states are entitled to broad leeway in enacting reasonable, even-handed legislation to ensure that elections are carried out in a fair and orderly manner." *Id.* at 1105.

Applying the two-track test for evaluating constitutional challenges to electoral laws formulated in *Burdick*, the *Weber* court found the use of paperless, touchscreen voting systems did not severely restrict the right to vote.[18] *Id.* at 1106. The *Weber* court noted, "No balloting system is perfect." *Id.* It went on to explain, "it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems. So long as their choice is reasonable and neutral, it is free from judicial second-guessing." *Id.* at 1107. The Ninth Circuit has explained on other occasions that "laws that burden the right to vote only incidentally need not be strictly scrutinized." *Gonzalez v. Arizona*, 485 F.3d 1041, 1049 (9th Cir. 2007); *see also Libertarian Party of Wash. v. Munro*, 31 F.3d 759, 761 (9th Cir. 1994) ("If the burden is slight, the procedures will survive review as long as they have a rational basis.").[19]

In arguing for intermediate review, the plaintiffs rely primarily on *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam). The Supreme Court's opinion in *Bush* was quickly issued in the wake of the

---

[17]   In cases where a plaintiff is minimally or severely burdened, it would not matter whether a court proceeded under the balancing approach advanced by Justice Stevens or the two-track approach advanced by Justice Scalia.

[18]   Although decided prior to *Crawford*, because the burden imposed in *Weber* was minimal if not non-existent, this Court finds had the Ninth Circuit decided *Weber* under Justice Stevens' balancing approach, it would have reached the same result as it did under *Burdick*'s two-track approach. Thus, *Crawford* has not changed the utility of *Weber*'s holding.

[19]   Again, even though decided prior to *Crawford*, because these cases dealt with minimal burdens, the Court may consider them, as their holdings would not change under a balancing or a two-track approach.

contested Florida recount for that year's presidential election, just six days after issuing a writ of certiorari, *Bush*, 531 U.S. at 98-100.  The Supreme Court held the Florida Supreme Court's order for a recount of disputed ballots violated the Equal Protection Clause because it failed to ensure uniform standards across counties for accepting or rejecting contested ballots.  *Bush*, 531 U.S. at 105-06.  In their argument, the plaintiffs claim the defendants frame the debate here as involving only rational or strict scrutiny, "without mentioning intermediate review, which *may* have been utilized in *Bush*, 531 U.S. 98." Docket No. 140, at 8 (emphasis added).  The Court finds little support for the plaintiffs' position.

///

///

The Court first notes the plaintiffs fail to cite to where in *Bush*, the Supreme Court applied intermediate scrutiny.  They cannot, because there is no clear indication the Supreme Court did.  The most significant passages in the five-justice majority opinion state:

> The recount process, in its features here described, is inconsistent with the *minimum procedures* necessary to protect the fundamental right of each voter in the special instance of a statewide recount under the authority of a single state judicial officer.  *Our consideration is limited to the present circumstances*, for the problem of equal protection in election processes generally presents many complexities.
> The question before the Court is not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections.  Instead, we are presented with a situation where a state court with the power to assure uniformity has ordered a statewide recount with *minimal procedural safeguards*.  When a court orders a statewide remedy, there must be at least some assurance that the *rudimentary requirements* of equal treatment and fundamental fairness are satisfied.

*Bush*, 531 U.S. at 109 (emphasis added).

At no point in *Bush*, did the Court discuss any level of applicable scrutiny, nor did it indicate what severity of burden lay upon the Florida voter.  What the Court made clear was that in limiting its consideration "to the present circumstances," it found the Florida Supreme Court had ordered a state-wide recount without ensuring each county would utilize the same procedure.  The Court found this failed to ensure "minimum" or "rudimentary" equal protection.  Such language does not support a conclusion the *Bush* Court applied anything more than rational scrutiny.

The plaintiffs cite two cases which allegedly support their position, *Common Cause Southern Christian Leadership Conference of Greater Los Angeles v. Jones*, 213 F. Supp. 2d 1106 (C.D. Cal. 2001) (*Common Cause*) and *Southwest Voter Registration Educational Project v. Shelley*, 278 F. Supp.

2d 1131 (C.D. Cal. 2003) (*SVREP*).  Docket No. 140, at 8.  Neither case, however, supports the plaintiffs' argument.  The *Common Cause* case held the *Bush* Court:

> *did not articulate a standard of review* in this case.  It merely said that a State may not value one person's right to vote over another via "arbitrary and disparate treatment." 531 U.S. at 104-05, 121 S.Ct. 525.  While *this language connotes a more lenient test akin to rational basis*, the Court cited to *Harper* [*v. Virginia Board of Elections*, 383 U.S. 663 (1966)] and *Reynolds* [*v. Sims*, 377 U.S. 533 (1964)] when discussing this standard.  Though *Reynolds* does not provide a clear standard, *Harper* adopts a standard of at least intermediate, and possible, strict scrutiny.  Thus, it appears that *perhaps the Court was using a heightened standard of scrutiny but also was finding the Florida recounts to be arbitrary and discriminatory.*

*Common Cause*, 213 F. Supp. 2d at 1109 (emphasis added).

///

*SVREP* was decided by the same judge who decided *Common Cause*.  *SVREP*, 278 F. Supp. 2d at 1133.  In it, he reiterated his *Common Cause* holding, noting "the per curiam opinion *repeatedly* couched its decision in language evocative of rational basis review."  *Id.* at 1140 (emphasis added).  The court further held while *Bush* could be read as applying an elevated scrutiny, because this "would be in tension with the Supreme Court's prior voting rights jurisprudence, there are many reasons to believe that the *Bush* Court's analysis was limited to its unique context."  *Id.* at 1140.[20]  These speculations do not clearly indicate the *Bush* Court applied anything other than a rational level of scrutiny

But even if this Court had such indications, by its own language, and universal agreement, *Bush* does not apply outside its own facts and circumstances:  a court-ordered statewide recount, by a body charged with ensuring uniformity among counties, which failed to do so.  *Bush*, 531 U.S. at 109; *see, e.g.*, *Wyatt v. Dretke*, 165 Fed. Appx. 335, 340 (5th Cir. 2006) (per curiam) (unpublished) ("on its face, the *Bush v. Gore* holding is limited to the facts at issue there---the 2000 presidential election"), *cert. denied sub nom.*, *Wyatt v. Quarterman*, 548 U.S. 932 (2006), *cited with approval in Coleman v. Quarterman*, 456 F.3d 537, 542-43 (5th Cir. 2006), *cert. denied*, 127 S.Ct. 2030 (2007); *Reay v. Scribner*, No. CIV S-02-2067 GEB DAD P, slip. op., 2008 WL 162600, *30 (E.D. Cal. Jan. 17, 2008) ("The Supreme Court expressly limited its analysis to the unique circumstances relating to the 2000

---

[20]     On appeal, the Ninth Circuit reversed, 344 F.3d 882 (9th Cir. 2003), then granted a rehearing en banc, 344 F.3d 913 (9th Cir. 2003), then affirmed, reversing the appellate panel, without relying on *Bush*, 344 F.3d 914, 918-19 (9th Cir. 2003).

presidential election process in Florida and the various recount procedures developed to address those circumstances."); *Nguyen v. Runnels*, No. C 04-1124 SBA, slip. op., 2007 WL 879008, *18 (N.D. Cal. Mar. 21, 2007) ("*Bush v. Gore* applied only to the unique circumstances relating to the 2000 election."); *Austin v. Wilkinson*, 502 F. Supp. 2d 660, 671 n.6 (N.D. Ohio 2006); *Walker v. Exeter Region Co-op Sch. Dist.*, 157 F. Supp. 2d 156, 159 n.6 (D.N.H. 2001) ("[*Bush v. Gore*'s] applicability to this or any other case involving concerns over voting rights and equal protection is dubious."); *SVREP*, 278 F. Supp. 2d at 1140-41 (quoting *Bush*'s limiting language); *see also Spears v. Stewart*, 283 F.3d 992, 996 (9th Cir. 2002) (Reinhardt, J., dissenting) (suggesting majority's rule is like that of *Bush*: "good for this case and this case only"); *Sorchini v. City of Covina*, 250 F.3d 706, 709 n.2 (9th Cir. 2001) (per curiam, Kozinski, Tallman, Zapata, JJ.) (citing *Bush* for proposition that particular argument is persuasive "only in this case"). Thus, the Court finds no support in *Bush v. Gore* for applying intermediate scrutiny to a disability-based challenge to the mechanics or use of specific types of voting equipment under California election laws.

Juxtaposed against plaintiffs' unsupported claim and the highly limited applicability of *Bush* is the fact the *Burdick* standard had been almost universally recognized by the federal courts as the appropriate test for equal protection challenges to state election laws, particularly those dealing with the "mechanics of elections." *See, e.g.*, *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 585 (6th Cir. 2006); *Weber*, 347 F.3d at 1106; *Lerman v. Bd. of Elections in N.Y.*, 232 F.3d 135, 145 (2d Cir. 2000); *Libertarian Party of Wash.*, 31 F.3d at 761; *Am. Ass'n of People with Disabilities v. Shelley*, 324 F. Supp. 2d 1120, 1127 (C.D. Cal. 2004) (*AAPD*).

Admittedly, the Supreme Court's recent decisions in *Washington State Grange*, following *Burdick*'s two-track approach, and *Crawford*, with three Justices favoring *Burdick*'s two-track approach, and three Justices favoring a "balancing approach," have engendered some confusion on the issue, superficially legitimizing the plaintiffs' request. Nonetheless, as mentioned above, and as discussed below in detail, because the plaintiffs have only shown a minimal burden on their right to vote, the rational basis test applies here, whether the Court uses a "balancing approach" or a "two track approach."

There is no need, however, for the Court to take two roads to the same destination. Thus, for

simplicity, economy, and efficiency, *Burdick* and *Weber* will provide the authoritative guideposts for the Court's analysis.  The Court will thus weigh the character and magnitude of the asserted injury to the rights protected by the Fourteenth Amendment that the plaintiffs seek to vindicate against the precise interests put forward by the defendants as justifications for the burden imposed by their choice of balloting systems.  The Court's analysis will also be informed by the *Weber* court's declaration that no balloting system is perfect and that "it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems.  So long as their choice is reasonable and neutral, it is free from judicial second-guessing."

///

///

**4.    The Character and Magnitude of the Restrictions Imposed on Visually and Manually Impaired Voters and Whether they are Reasonable and Neutral**

**a.    Stephen Fort, Alameda County, and the DRE**

**i.    The character and magnitude of the DRE's restrictions on a visually impaired voter.**

Alameda County provides a Sequoia DRE voting unit in each precinct.  For visually impaired voters, the DRE unit has an audio component that enables them to listen to candidate names through headphones and to vote using distinctively shaped keys.  *See* Docket No. 4 (FAC, ¶ 54).  In California, by definition, the terms "DRE voting system" "mean[] a voting system that records a vote electronically and does not require or permit the voter to record his or her vote directly onto a tangible ballot."  CAL. ELEC. CODE § 19251(b).

The Ninth Circuit described a DRE system in *Weber*, 347 F.3d at 1104:

> In touchscreen (DRE) systems, a voter whose eligibility has been verified by an election official is given a card that is used to activate a freestanding voting machine.  On-screen directions tell the voter how to select candidates or issues by touching the screen over the corresponding choice.  The voter may make changes by de-selecting a response already made, and making another selection in its place.  The voter is required to review the entire ballot at the end of the process.  The voter then touches a 'Cast Vote' cue on the last screen to record his or her vote.

By definition, VVPAT "means a component of a direct recording electronic voting system that prints a contemporaneous paper record copy of each electronic ballot and allows each voter to confirm his or her selections before the voter casts his or her ballot."  ELEC. CODE § 19251(c).  Somewhat

circularly, the terms "'Paper record copy' mean[] an auditable document printed by a voter verified paper audit trail component that corresponds to the voter's electronic vote and lists the contests on the ballot and the voter's selections for those contests.  A paper record copy is not a ballot." *Id.* § 19251(e).

///

///

///

///

///

///

///

In a DRE machine using a VVPAT system:

> After completing all voting, the voting machine prints a paper facsimile of the votes cast by the voter, which allows that voter to confirm that the machine is indeed correctly recording the votes cast by the voter.  The paper facsimile is displayed through a pane of glass, but is not given to the voter.  Rather, the printout is kept by the machine internally.

*Nguyen v. Nguyen*, 158 Cal. App. 4th 1636, 1642, 70 Cal. Rptr. 3d 753 (2008).[21]

In addition to the VVPAT record, DRE units record all user activities, i.e., on-screen selections, in a memory stick or memory storage device called a "mobile ballot box" or MBB.  *Id.*  "When the votes are counted, the data on the MBB is downloaded in order to ascertain the vote count from the machine." *Id.*

Alameda County used a DRE voting system for the June 2006 election at early voting locations for disabled voters.  *See* Docket No. 4 (FAC, ¶ 59).  Effective January 1, 2006, California election law requires that all DRE voting systems provide "an accessible voter verified paper audit trail." *See* ELEC. CODE § 19250(c).  "'Accessible' means that the information provided on the paper record copy from the voter verified paper audit trail mechanism is provided or conveyed to voters via both a visual and

---

[21]     It is unclear to the Court how if the "paper facsimile" prints "[a]fter completing all voting," *Nguyen*, 158 Cal. App. 4th at 1642, it can "allow[] each voter to confirm his or her selections before the voter casts his or her ballot[,]" ELEC. CODE § 19251(c), though it is possible the terms "voting" and "cast" have different meanings, and the former act proceeds the latter.

a nonvisual method, such as through an audio component." *Id.* § 19251(a).  Further, all DRE voting systems "shall include a method by which a voter may electronically verify, through a nonvisual method, the information that is contained on the paper record copy of that voter's ballot."  *Id.* § 19250(d).

According to the plaintiffs, the addition of the VVPAT device renders the DRE voting system inaccessible to voters with visual disabilities.  They claim, "Sighted voters can review their vote on the paper produced by the VVPAT to ensure that it comports with their desired selection.  Non-sighted voters, however, do not have access to or the ability to review the information provided by the VVPAT device."  Docket No. 4 (FAC, ¶ 57-58).  The plaintiffs therefore challenge the constitutionality of California Elections Code sections 19250 through 19253 mandating the use of the VVPAT.

The plaintiffs, however, have qualified their equal protection challenge.  They stress they "do not challenge the VVPAT itself, or its use to determine if discrepancies exist between DRE electronic votes and the VVPAT or the primacy of the VVPAT if discrepancies exist.  Plaintiffs challenge only its use as the official vote where there is no discrepancy with the electronic vote and thus no necessity to use it as the official vote."  Docket No. 119, at 1 n.1; *see also* Docket No. 140, at 1 ("Plaintiffs challenge only the Bowen bill requirement that the VVPAT is the official ballot in recounts where there is no discrepancy between the electronic vote and the VVPAT").[22]

The core of the disputed election law is section 19253:

(a)  On a direct recording electronic voting system, the electronic record of each vote shall be considered the official record of the vote, except as provided in subdivision (b).

(b)(1)  The voter verified paper audit trail shall be considered the official paper audit record and shall be used for the required 1-percent manual tally described in Section 15360 and any full recount.

(2)  The voter verified paper audit trail shall govern if there is any difference between it and the electronic record during a 1-percent manual tally or full recount.

---

[22]    Likewise, plaintiffs note section 12951(d) mandates that all DRE voting systems "shall include a method by which a voter may electronically verify, through a nonvisual method, the information that is contained on the paper record copy of that voter's ballot." Docket No. 19, at 10 n.2.  They argue the ability of the visually impaired to verify their electronic vote via an audio component only satisfies this mandate, when the electronic vote is the "official ballot," but not when the VVPAT is the "official ballot." *Id.*  Thus, plaintiffs are satisfied with audio "verification" as long as the electronic vote is the "official ballot."

1   ELEC. CODE § 19253; *Nguyen*, 158 Cal. App. 4th at 1651.[23]

2   ///

3        The defendants correctly point out that the plaintiffs' equal protection challenge is illogical, as

4   it turns on a legal impossibility under section 19253.  The plaintiffs argue it would be unconstitutional

5   to use the VVPAT as the official paper audit record in a situation where there is *no discrepancy* between

6   it and the electronic record downloaded from the DRE units' MBBs.  As defendants correctly note, in

7   a situation where there is no discrepancy between the VVPAT and the electronic record, the former may

8   not govern over the latter.  As section 19253 makes clear, when DRE units are used, the electronic

9   record "shall be considered the official record of the vote," unless one or both of two situations occur.

10   ELEC. CODE § 19253(a).

11        The first situation may arise under a one percent manual tally, performed under section 15360.

12   *See id.* § 19253(b); *Nguyen*, 158 Cal. App. 4th at 1643.  In this process, which is mandatory for every

13   election, officials compare a sample of DRE units' VVPATs or paper record copies with their electronic

14   records, in order to identify and resolve any discrepancies between them.  ELEC. CODE §§ 15360(a), (e),

15   15627(b) (defining manual counting process for DRE units); *see Nguyen*, 158 Cal. App. 4th at 1643,

16   1651.  In the event of any discrepancies, the VVPATs or paper record copies govern over the electronic

17   records.  ELEC. CODE §§ 15630(e), 19253(b); *see Nguyen*, 158 Cal. App. 4th at 1643.

18

---

19   [23]    Section 15360(a) states, in part, "During the official canvass of every election in which a voting
20   system is used, the official conducting the election shall conduct a public manual tally of the ballots
    tabulated by those devices, including vote by mail voters' ballots, cast in 1 percent of the precincts
21   chosen at random by the elections official."  Section 15360(e) states:

22           The official conducting the election shall include a report on the results of the 1 percent
        manual tally in the certification of the official canvass of the vote.  This report shall
23           identify any discrepancies between the machine count and the manual tally and a
        description of how each of these discrepancies was resolved.  In resolving any
24           discrepancy involving a vote recorded by means of a punchcard voting system or by
        electronic or electromechanical vote tabulating devices, the voter verified paper audit
25           trail shall govern if there is a discrepancy between it and the electronic record.

26   Elections Code section 336.5 defines the one percent manual tally process:

27           "One percent manual tally" is the public process of manually tallying votes in 1 percent
        of the precincts, selected at random by the elections official, and in one precinct for each
28           race not included in the randomly selected precincts.  This procedure is conducted during
        the official canvass to verify the accuracy of the automated count.

1     The second situation may arise if a full recount is requested under sections 15620 (non-state-

2 wide election) or 15621 (state-wide election) of the Elections Code.  *See* ELEC. CODE § 19253(b);

3 *Nguyen*, 158 Cal. App. 4th at 1651.  Under section 15627(a) of the Elections Code:

> If in the election which is to be recounted the votes were recorded by means of a
> punchcard voting system or by electronic or electromechanical vote tabulating devices,
> the voter who files the declaration requesting the recount may select whether the recount
> shall be conducted manually, or by means of the voting system used originally, or both.

*Nguyen*, 158 Cal. App. 4th at 1651.

Thus, if a voter believes the electronic record itself would benefit from a recounting by re-downloading

the MBBs, then he or she may request a recount "by means of the voting system used."  ELEC. CODE

§ 15627(a); *Nguyen*, 158 Cal. App. 4th at 1651.  Alternatively, if he or she believes the electronic record

would benefit from a comparative recount, that is a comparison with a manual counting of the VVPAT

///

///

 or paper record copies,[24] then he or she may request a manual recount.  *See id.*  Additionally, a voter

with sufficient means, may request both types of recounts.[25]  *See id.*  In a full *manual* recount, in the

event of any discrepancies between the VVPAT or paper record copies and the electronic record, the

former governs the latter.  *Id.* § 19253(b); *Nguyen*, 158 Cal. App. 4th at 1651.

     The Court notes in both situations discussed, section 19253 only allows the VVPAT or paper

record to govern the electronic record when there are *discrepancies* between them.  In contrast, where

there is *no discrepancy*, the electronic record governs.  Thus, the plaintiffs' argument that section 19253

---

[24]     Section 15627(b) (emphasis added) provides, "For purposes of direct recording electronic voting
systems, 'conducted manually' means that *either the paper record copies or the voter verified paper
audit trail* of the electronically recorded vote are counted manually, as selected by the voter who
requests the recount."

[25]     Under section 15624 of the Elections Code, a voter must post a daily bond to cover recount
costs, and will not receive any money back unless the recount is successful, i.e., shows the candidate
or referendum in question:

> received the plurality of votes cast which it had not received according to the official
> canvass or, in an election where there are two or more candidates, the recount results in
> the candidate for whom the recount was requested appearing on the ballot in a
> subsequent runoff election or general election who would not have so appeared in the
> absence of the recount.

violates a visually impaired voter's equal protection, because it allows the VVPAT or a paper record to govern the electronic record, where there is *no discrepancy* between them, is clearly incorrect, as this statute does not so allow.  Because the plaintiffs have failed to establish the use of the VVPAT under section 19253 places *any* burden on a visually impaired voter, much less a severe one, the defendants need only show that employing the VVPAT with the DRE is reasonable and neutral and rationally related to a legitimate government interest.

> **ii.     The interests put forward by the defendants as justifications for the DRE's restrictions on a visually impaired voter.**

The VVPAT requirement was intended to ensure the accuracy and integrity of the election process.  *See Nguyen*, 158 Cal. App. 4th at 1657 ("[S]ection 19253 was the product of the Legislature's effort to insure that electronic voting machines were kept honest by requiring them to have a means of objective, hard verification of their otherwise ephemeral electronic data.").  The plaintiffs themselves declared this was the purpose of the VVPAT requirement.  *See* Docket No. 119, at 4 ("In order to assure that the DRE electronic vote is accurate, however, California required that all DREs have a voter verified paper audit trail (VVPAT) by January 1, 2006.").  The State of California and Alameda County have rationally concluded that requiring a paper audit trail for electronic voting machines furthers this legitimate goal.  *See Burson v. Freeman*, 504 U.S. 191, 199 (1992) (The government has a compelling interest in protecting the integrity of the elections process.).  The Court concurs with the conclusion of the court in *AAPD*, 324 F. Supp. 2d at 1128-29, that the defendants' "decisions to modify DREs to include VVPAT technology [are] reasonable one[s], well within [their] discretion and authority, and consistent with [their] obligation to assure the accuracy of election results."

> **b.     Russ Bohlke, Marin County, and the AutoMARK**

> **i.     The character and magnitude of the AutoMARK's restrictions on a manually impaired voter.**

The plaintiffs contend the use of the AutoMARK voting system burdens manually disabled voters "who cannot grasp paper with their hands."  Docket No. 119, at 2.  They add, "these voters cannot insert the paper ballot into the Automark machine or remove it or place it into a privacy sleeve or put it in the ballot box, without assistance from poll officials."  *Id*.  Thus, manually disabled voters' votes "are at risk of being seen by poll officials," and they "cannot vote privately and independently like all

32

1   other voters in these counties." *Id.*  According to the plaintiffs, Marin County could allow manually

2   disabled voters unable to use the AutoMARK system an alternative by providing a DRE system at every

3   polling location, and its failure to do so violates the equal protection rights of such voters.

4        In describing the burdens associated with using the AutoMARK, plaintiff Bohlke declared as

5   follows:

6           The necessary assistance of third-parties means that voters like me suffer the following
            burdens not suffered by non-disabled voters in Marin County:  (1) we risk revealing our
7           votes to a third party; (2) we risk having our votes revealed by the assisting party, or
            overheard and observed by other people; (3) we risk having the third party attempt to
8           influence our candidate choice; (4) we risk having our requested votes improperly cast;
            (5) we have had to vote in a manner that singles us out in the polling place; (6) we have
9           had to wait long periods of time until a third party is available to assist us; and (7) we
            have had to suffer embarrassment and stress during the voting process for each of the
10          foregoing reasons.

11  Docket No. 120 (Bohlke Decl., ¶ 7).

12  ///

13       Plaintiff Bohlke's listed burdens rely on speculative risk or the ancillary effects of third party

14  assistance, but not on evidence of any concrete harm.  Such speculations or effects are insufficient under

15  Supreme Court and Ninth Circuit precedent to demonstrate a severe burden on the fundamental right

16  to vote.  For instance, in *Washington State Grange*, 128 S. Ct. at 1191-95, the Supreme Court concluded

17  that "sheer speculation" of voter confusion did not constitute a severe burden under the *Burdick*

18  standard.  Similarly, in *Libertarian Party of Washington*, 31 F.3d at 760, the Ninth Circuit considered

19  an equal protection challenge to a Washington state election law that effectively required minor party

20  candidates to announce their candidacies four to five weeks earlier than major party candidates.

21  Applying *Burdick*, the *Munro* court weighed the severity of this handicap and determined that

22  Washington's regulations did not severely burden the constitutional rights of minor parties or their

23  candidates.  *Id.* at 763.  The court noted the plaintiffs' claim they were disadvantaged vis-a-vis major

24  parties was "entirely speculative," and that the plaintiffs did not cite any "instance in which any

25  candidate has ever been denied access to the Washington ballot, or otherwise been disadvantaged,

26  because of the procedures they assail."  *Id.*

27       Likewise, the plaintiffs have presented no evidence that a voter using an AutoMARK has ever

28  been pressured by an assisting third party to change his or her vote; has ever been prevented from voting

33

for the candidate of his or her choice; or has ever had his or her ballot improperly cast or not counted.

The plaintiffs only evidence comes from Bohlke's declaration, where he concludes, "The necessary assistance of the poll worker eliminated any privacy because I'm sure he could observe my ballot." Docket No. 142, ¶ 9. And, he claims that the need for assistance in using the AutoMARK singles him out at the polling place, causes him to have to wait long periods of time until a third party is available to assist him, and for these reasons causes embarrassment and stress during the voting process. The plaintiffs themselves acknowledge, however, "there is no general constitutional . . . right to vote privately and independently in state elections." Docket No. 150, at 2. Indeed, the court in *AAPD*, 324 F. Supp. 2d at 1131, noted that the ability "to vote unassisted and in private" "is not a right currently

///

///

///

 protected by [constitutional] law."[26] As a matter of fact, private voting has evolved over time from an earlier practice of open, oral voting. *See Burson*, 504 U.S. at 200-06 (plurality opinion). Another federal court has also concluded that third-party assistance from poll workers does not severely impinge the equal protection rights of visually impaired voters. In *Smith v. Dunn*, 381 F. Supp. 822, 826 (N.D. Tenn. 1974), the court held there was no violation of a blind person's Fourteenth Amendment right to a secret ballot by an election provision requiring the blind to receive assistance from one election judge while in the presence of a second election judge of a different political affiliation. By extension of the reasoning of these cases, the fact a manually impaired voter may require the assistance of a poll worker is insufficient, in itself, to demonstrate a severe burden for purposes of the *Burdick* analysis.

Moreover, Bohlke's last several listed burdens associated with using the AutoMARK are complaints about its inconvenience. The failure to provide the most convenient method of voting does

---

[26] The Court also noted under 28 C.F.R. § 35.150(b)(1), implementing Title II of the Americans with Disabilities Act (ADA), "a public entity may employ such means as 'assignment of aides to beneficiaries . . . or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities.'" *AAPD*, 324 F. Supp. 2d at 1126. The Court also noted the ADA allows public entities to provide assistance to visually impaired voters, rather than ensure their voting privacy by providing Braille voting materials. *Id.* at 1126 & n.3.

1    not in itself severely burden the right to vote.  For instance, in *Selph v. Council of Los Angeles*, 390 F.

2    Supp. 58, 61 (C.D. Cal. 1975), the plaintiffs, registered voters with disabilities, asserted the failure to

3    provide polling places accessible to the disabled persons amounted to a denial of the right to vote, and

4    that such a denial called for the application of strict scrutiny.  The *Selph* court stated, however, that not

5    every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard

6    of review.  *Id.*  The court held that "[w]hereas here, the right [to vote] is not totally denied and there are

7    reasonable alternatives provided to the person who finds that his polling place is inaccessible to him,

8    the traditional standard of a rational relationship to a legitimate state objective is proper to follow."  *Id.*

9    at 62.[27]

10       In sum, as the plaintiffs have failed to demonstrate Marin County's use of the AutoMARK

11   severely burdens their right to vote under *Burdick* or *Weber,* Marin County need only demonstrate its

12   choice of the AutoMARK is rationally related to a legitimate governmental interest.

### ii.    The interests put forward by the defendants as justifications for the AutoMARK's restrictions on a manually impaired voter.

15       In his declaration, Marin County Registrar Michael Smith explained his reasons for selecting

16   the ESS AutoMARK voting systems:

> In or about early 2006, and after meeting with the disabled community, reviewing literature, and viewing demonstrations with various vendors, we decided that the County of Marin should use the ESS Automark machines.  I chose the ESS Automark because in my view, it was the best machine for people with disabilities.  The ESS Automark accommodates individuals with visual impairment, hearing impairment, or limited use of their arms.  Specifically, it allows voters with manual disabilities to vote, by using either a mouth stick or a sip and puff device to mark their ballots.  Additionally, I chose the ESS Automark system because it has a paper trail, which is important for security reasons.  The paper trail also alleviates the concerns that many voters have regarding the need to verify by paper the accuracy of votes.

22   Docket No. 101 (Smith Decl.).

23       Marin County thus chose the AutoMARK because:  (1) it "was the best machine for people with

24   disabilities," and (2) it has a paper trail, which is "important for security reasons."  Marin County has

---

26   [27]    The plaintiffs also argue that Marin County unconstitutionally burdens the equal protection rights of manually disabled voters by failing to provide assistive devices.  They contend that "the lack of assistive devices is the functional equivalent of the poll tax in *Harper*."  Docket No. 150, at 12.  The defendants object to the plaintiffs' assistive device claim.  They maintain it was not part of the plaintiffs' first amended complaint and thus they have not had the opportunity during discovery to determine the facts of this claim.  For reasons discussed in part 1.c.iii *supra*, this objection is SUSTAINED.

a compelling interest in protecting the integrity of the elections process. *See Burson*, 504 U.S. at 199. And, choosing a system with a paper audit trail is rationally related to a legitimate government interest in protecting the integrity and accuracy of elections.

As for Marin County's first reason, in *Weber*, 347 F.3d at 1107, the Ninth Circuit explained, "it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems. So long as their choice is reasonable and neutral, it is free from judicial second-guessing." Here the Registrar of Marin County met with members of the disabled community, reviewed various options, and determined the AutoMARK was the best choice for addressing the concerns of voters with diverse disabilities. There is no evidence to suggest this determination was not reasonable or neutral, and therefore, it was in Marin County's discretion to make. *See AAPD*, 324 F. Supp. 2d at 1128-29.

### c. Ivana Kirola, San Francisco, and the AutoMARK

Plaintiff Ivana Kirola is a manually impaired San Francisco voter. Like plaintiff Bohlke, Kirola has testified she cannot feed the paper ballot into the machine, nor remove it from the machine, nor place it in the ballot box, without third-party assistance. She brings the same equal protection challenge to the County of San Francisco's use of the AutoMARK as Bohlke brings to its use by Marin County.

Defendant Arntz of San Francisco County has informed the Court and other parties that as of February 2008, San Francisco will no longer use the AutoMARK voting machines. *See* Docket No. 162. The county has a new contract in place to provide at least one DRE machine at every polling place beginning in 2008. The DRE machines were purchased in part by trading in AutoMARK machines and will be in place for the February and November 2008 elections. *Id.* The parties' cross-motions for summary judgment of the plaintiffs' claim that San Francisco's utilization of AutoMARKs is unconstitutional and violates the rights of Ivana Kirola are now moot.

### 5.    The Plaintiffs' Motion for Leave to File a Supplemental Complaint

Plaintiffs PVA, AAPD, Kirola, Bohlke, and Fort seek leave of Court, pursuant to Federal Rule of Civil Procedure 15(d), to file a supplemental complaint against the City and County of San Francisco to assert two new claims. *See* Docket No. 162. First, they allege that in a November 2007 election that San Francisco did not provide assistive devices, such as sip and puff devices, to manually disabled voters. *See id.*, at 1. While the 2007 election involved AutoMARK machines, they also claim San

Francisco will not offer these devices for a February 2008 election, in which San Francisco will also use newly acquired Sequoia DRE machines with a VVPAT. *Id.* Second, these plaintiffs allege that due to the acquisition of the DRE machines, visually impaired San Francisco voters will have new claims similar to visually impaired voters in Alameda and Marin counties. *Id.*, at 2-3.

Defendant Arntz does not oppose supplementing with claims by visually impaired voters. He does, however, oppose supplementing with claims by manually impaired voters, on two grounds. First, he argues plaintiffs cannot raise these claims regarding the AutoMARK machines, because San Francisco no longer uses them, instead relying solely on the Sequoia DRE machines. Docket No. 2, at 2-3. Second, he argues the assistive device claim is not based on a "transaction, occurrence, or event that happened after the date of the pleading to be supplemented." *See id.*, at 4. Specifically, he argues plaintiffs raised this issue in their October 2007 motion for summary judgment, where they argued they had raised it in their FAC. *Id.*

///

Federal Rule of Civil Procedure 15(d) governs supplemental pleadings. It states:

> On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

It is within a court's broad discretion to grant or deny a motion to supplement, but leave should generally be granted absent undue delay, prejudice to the opposing party, or futility. *See Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995); *Keith v. Volpe*, 858 F.2d 467, 473-74 (9th Cir. 1988); *LaSalvia v. United Dairymen of Ariz.*, 804 F.2d 1113, 1119 (9th Cir. 1986). Supplemental pleadings are generally favored because they promote judicial economy and convenience by permitting courts to dispose of related claims and issues in one matter. *Keith*, 858 F.2d at 473-74. The legal standard for granting or denying a motion to supplement under Rule 15(d) is the same as for amending one under Rule 15(a). *Glatt v. Chic. Park Dist.*, 87 F.3d 190, 194 (7th Cir. 1996); *Lewis v. Knutson*, 699 F.2d 230, 239 (5th Cir. 1983); 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1504, pp. 185-86 (2d ed.1990).

Thus, examining Rule 15(a) decisions shows that before discovery is completed the proper standard for assessing futility is the same standard used to decide a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991); *Miller v. Rykoff-Sexton, Inc*., 845 F.2d 209, 214 (9th Cir. 1988). That is, whether the supplemented claim would state one upon which relief could be granted. *See id.* In contrast, when a motion for summary judgment is pending, a court may require a movant show "substantial and convincing evidence," before granting a motion to supplement. *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996); *Cowen v. Bank United of Tex.*, FSB, 70 F.3d 937, 944 (7th Cir. 1995); *Justin v. City and County of S.F.*, No. C 05-4812 MEJ, slip op., 2008 WL 544466, *4 (N.D. Cal. Feb. 26, 2008); *Skoog v. Clackamas County*, No. CIV. 00-1733 MO, 2004 WL 102497, *5 (D. Or. Jan. 12, 2004) (unreported), *aff'd in part, rev'd in part on other grounds*, 469 F.3d 1221 (9th Cir. 2006); *Bark v. Larsen*, No. CIV.06-1119 AS, 2006 WL 4852688, *7 (D. Or. Jun 26, 2006) (unreported); *Twin City Fire Ins. Co., Inc. v. Mitsubishi Motors Credit of Am., Inc.*, No. SA CV 04 43 GLT MLGx, 2005 WL 5980994, *2 (C.D. Cal. Feb. 22, 2005) (unreported); *Maldonado v. City of Oakland*, No. C 01 1970 MEJ, 2002 WL 826801, *4 (N.D. Cal. Apr. 29, 2002) (unreported); *Gordon v. N. Am. Co. for Life and Health*, No. CIV.99-1964-E-NLS, 2000 WL 1427343, *5 (S.D. Cal. Sep. 14, 2000) (unreported). The higher standard prevents a movant from using supplementation to avoid summary judgment. *See Schlacter-Jones v. Gen. Tel. of Cal.*, 936 F.2d 435, 443 (9th Cir. 1991), *abrogated on other grounds by Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683 (9th Cir. 2001). In addition, after a motion for summary judgment has been filed, a court may deny a motion to supplement where the supplemented claim(s) would not survive a motion for summary judgment. *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001).

Applying this legal standard to the motion to supplement, the Court DENIES it in part and GRANTS it in part. With regards to the claims for visually impaired San Francisco voters, the Court first notes that PVA does not bring these claims. Docket No. 162, at part III. The Court DENIES the motion with prejudice with regards to plaintiff Kirola, as she is not visually impaired, and with regards to plaintiffs Bohlke and Fort, as they do not reside in San Francisco. With regards to plaintiff AAPD, the Court DENIES the motion without prejudice, as it has not presented any evidence to the Court, much less "substantial and convincing evidence," by which the Court could determine whether AAPD's

supplemented claim(s) could survive a motion for summary judgment.  This is especially relevant here, where the Court has already resolved in defendant McDonald's favor, claims brought by visually impaired voters using Sequoia DRE units with VVPAT devices.

With regards to the assistive device claims for manually impaired San Francisco voters, the Court again DENIES the motion with prejudice with regards to plaintiffs Bohlke and Fort, as they do not reside in San Francisco.  With regards to plaintiffs PVA, AAPD, and Kirola, the Court GRANTS the motion.  As discussed in part 1.c.iii *supra*, plaintiffs did not raise the assistive device claim in their FAC.  The issue is thus new and untested in this matter.  At the same time, however, it is clearly related to the other voter-impairment claims in this matter.  Thus, it would promote judicial economy and convenience for the Court to dispose of all of them together.  While the Court has the discretion to require a greater evidentiary showing to screen these claims for futility under Rule 15, the Court finds it would be more efficient and a better process to screen them more thoroughly through civil discovery, supplemental answers, and/or dispositive motions.

Although defendant Arntz opposes supplementation with these claims, his arguments are unpersuasive.  The Court first notes, Arntz does not argue supplementation would cause him any undue delay or prejudice.  He does, however, argue a form of futility regarding claims predicated on AutoMARKs.  In this regard, the Court  notes it will only allow plaintiffs PVA, AAPD, and Kirola to supplement regarding the Sequoia DRE machines, as San Francisco no longer uses the AutoMARK machines.  As for Arntz's timing argument, he does not point the Court to any case authority which stands for the proposition that where a defendant repeatedly engages in an allegedly illegal act, before and after suit has been filed, the later acts may not form the basis of a motion to supplement under Rule 15(d).

Based on the foregoing, plaintiffs PVA, AAPD, and Kirola have twenty days from the date of the entry of this order to file a supplemental complaint against defendant Arntz, but only for claims regarding assistive devices, such as sip-and-puff devices, or the lack thereof, for manually-impaired San Francisco voters using a Sequoia DRE machine with a VVPAT.

**6.      The Plaintiffs' Motion for Leave to File a Supplemental Pleading for the Motion for Summary Judgment**

On July 9, 2008, plaintiffs PVA, AAPD, Kirola, Bohlke, and Fort filed a Motion for Leave to File a Supplemental Pleading in Support of Plaintiffs' Motion for Summary Judgment. *See* Docket No. 194. Defendant Smith opposes. *See* Docket No. 201. These plaintiffs claim defendant Smith testified in his deposition that upon request at polling places, Marin County would provide manually disabled voters with sip-and-puff devices. *Id.*, at 3 (Mem. of P. & A., at 1). These plaintiffs also claim defendant Smith in later communications indicated Marin County would not do this for the November 2008 election. *See id.* These plaintiffs seek to add this alleged new development to their motion for summary judgment. *See id.* As discussed in part 1.c.iii *supra*, however, there is no assistive device claim before the Court at this time. Thus, there is nothing for these plaintiffs to supplement. Further, plaintiffs Kirola and Fort are not suing defendant Smith. Thus, the Court DENIES this motion with prejudice against plaintiffs PVA, AAPD, Kirola, Bohlke, and Fort.

///

///

## CONCLUSION

Accordingly, the Court:

(1)     GRANTS defendant California Secretary of State Debra Bowen's Motion for Summary Judgment [Docket No. 103] against plaintiffs PVA, CCB, AAPD, Kirola, Bohlke, and Fort;

(2)     GRANTS defendant Michael Smith's Motion for Summary Judgment and Joinder to defendant Bowen's Motion for Summary Judgment [Docket No. 98] against plaintiffs PVA, AAPD, and Bohlke;

(3)     GRANTS defendant Dave MacDonald's Motion for Summary Judgment and Joinder to defendant Bowen's Motion for Summary Judgment [Docket No. 105] against plaintiff AAPD for lack of standing, and against plaintiff Fort on the merits;

(4)     DENIES as moot defendant John Arntz's Joinder to Bowen's Motion for Summary Judgment [Docket No. 116] against plaintiffs PVA, AAPD, and Kirola;

(5)     DENIES the Motion for Summary Judgment/Alternate Motion for Partial Summary Judgment [Docket No. 119] brought by plaintiffs PVA, AAPD, Kirola, Bohlke, and Fort, as to defendants Bowen, Arntz, Smith, and MacDonald, as follows:

(A)     The motion is DENIED with prejudice as to defendant Bowen, with respect to plaintiffs PVA, AAPD, Kirola, Bohlke, and Fort;

(B)     The motion is DENIED as moot as to defendant Arntz, with respect to plaintiffs PVA, AAPD, and Kirola;

(C)     The motion is DENIED with prejudice as to defendant Smith, with respect to plaintiffs PVA, AAPD, and Bohlke;

(D)     The motion is DENIED without prejudice as to defendant MacDonald, with respect to plaintiff AAPD due to lack of standing, and DENIED with prejudice as to defendant MacDonald, with respect to plaintiff Fort;

(6)     GRANTS in part and DENIES in part the Motion for Leave to File a Supplemental Complaint against the City and County of San Francisco [Docket No. 162] filed by plaintiffs PVA, AAPD, Kirola, Bohlke, and Fort as follows:

///

(A)     with regards to visually and manually impaired claims, DENIED with prejudice with regards to plaintiffs Bohlke and Fort;

(B)     with regards visually impaired claims, DENIED with prejudice with regards to plaintiff Kirola, but DENIED without prejudice with regards to plaintiff AAPD;

(C)     with regards to manually impaired claims, GRANTED with regards to plaintiffs PVA, AAPD, and Kirola.  These plaintiffs have twenty days from the date of the entry of this order to file a supplemental complaint against defendant Arntz, but only for claims regarding assistive devices, such as sip-and-puff devices, or the lack thereof, for manually-impaired San Francisco voters using a Sequoia DRE machine with a VVPAT.  Defendant Arntz will have twenty days from the date of service on him of these plaintiffs' supplemental complaint to file a supplemental answer or otherwise respond;

(7)     DENIES the Motion for Leave to File a Supplemental Pleading in Support of Plaintiffs' Motion for Summary Judgment [Docket 194] with prejudice against plaintiffs PVA, AAPD, Kirola, Bohlke, and Fort.

The telephonic Case Management Conference set for September 24, 2008 at 2:45 P.M. is continued to November 5, 2008, at 3:30 P.M.  The parties shall **meet and confer** prior to the conference

41

and shall prepare a joint Case Management Conference Statement which shall be filed no later than ten days prior to the Case Management Conference that complies with the Standing Order for All Judges of The Northern District of California and the Standing Order of this Court. *The parties shall indicate in the statement whether plaintiff CCB wishes to withdraw from this matter and why it and plaintiff AAPD have not dismissed defendant Oakley.* Plaintiffs shall be responsible for filing the statement as well as for arranging the conference call. All parties shall be on the line and shall call (510) 637-3559 at the above indicated date and time.


IT IS SO ORDERED.


September 8, 2008                              _____
                                              Saundra Brown Armstrong
                                              United States District Judge